Maria G. Miglietta v. Commissioner.
Miglietta v. Commissioner
Docket No. 108679.
United States Tax Court
1943 Tax Ct. Memo LEXIS 486; 1 T.C.M. (CCH) 499; T.C.M. (RIA) 43045; January 28, 1943
*486 Jacob Rabkin, Esq., for the petitioner. J. Richard Riggles, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: The Commissioner determined a deficiency in income tax against petitioner for the calendar year 1938 in the amount of $17,022.18. Two issues are involved; (1) the propriety of including in petitioner's gross income $62,068.88 reported on her return as capital gain; and (2) the deductibility of a loss sustained in the taxable year within the meaning of section 23 (3), Revenue Act of 1938. The case was submitted on oral testimony, exhibits and briefs. Findings of Fact The petitioner is an individual residing at 168 East 63rd Street, New York City. Her return was filed with the collector of internal revenue for the Second District of New York. Before attaining her majority petitioner inherited from her mother property worth approximately $300,000. Her father was appointed guardian of her person and property and throughout the guardianship the control of petitioner's property was subject to the supervision of the Surrogate's Court of New York. During this period the property increased in value until at the time petitioner reached her majority *487 on September 8, 1934, it had increased in value to approximately $600,000. After reaching her majority petitioner discussed with her father the problem of managing her property. She had no training or experience along that line and wanted her father to continue his management as he had done during her minority. She was spending much of her time abroad and, as it would be quite an inconvenience to her father to obtain her consent to all the transactions and in view of her lack of experience in business matters and the possibility of her marriage in Italy or France and the control of her property coming into the hands of her husband, both she and her father thought it best for her to authorize him to handle her inheritance. Upon termination of the guardianship he transferred the property from himself as guardian to himself in his own name. To carry out their understanding petitioner executed and delivered to her the following letter in her own handwriting: New York October 29, 1934 Mr. Romeo Miglietta, Present. My dear father, In consequence of the winding up of the general guardianship over my person and estate, upon my coming of age, and the distribution of the estate left by *488 mother, I now wish to set forth as a matter of record the understanding reached with you in regard to the further disposition of such estate. I hereby acknowledge and confirm that I have turned over to you all the property and securities as were released from the guardianship for the following purposes: First, That you may hold in your name, manage, sell, invest, and reinvest such property and securities, any and every part thereof, borrow money or make loans and generally use the principal and income for any purposes and in whatever manner you may see fit during your lifetime with the understanding that a monthly allowance will be made me as in your judgment is warranted by the circumstances from time to time and further that in the event of my marriage such allowance to be paid me out of the income of the estate will be fixed at one-quarter of the total yearly income realized from the date of such marriage. Second, I hereby agree that upon your death the property or securities which will at that time represent the principal of the estate be put into a trust fund with the New York Trust Company or any other Trustee or Trustees in New York or elsewhere in the United States or Foreign *489 Countries, as you may select, who are to administer the Estate until I reach the age of fifty when I shall make further provisions for the management and disposition of the Estate which will then be distributed to me. It is understood that such trust agreement for which you will arrange at such time and in such manner as you see fit will take effect after your death. This is our irrevocable agreement in connection with the present and future disposition of the Estate left by mother written in my own hand and to which we have both affixed our signatures on the day and year above mentioned. Your affectionate daughter - Maria Gabriella Miglietta. Agreed to: Romeo Miglietta This second sheet of letter addressed to Romeo Miglietta dated on this day, signed before me, October 29, 1934. (Signed) Albert F. Gatow Albert F. Gatow Notary Public, Bronx County
County Clerk's No. 16 Register's No. 32G35 Certificate filed in New York County
County Clerk's No. 205 Register's No. 5G112 Term expires March 30, 1935 Seal of Albert F. Gatow Notary Public Bronx County
Petitioner's father employed an accountant to open and maintain books of account to show the various transactions with respect *490 to his daughter's property and the income therefrom. Entries were made under the father's direction. None of his own private ventures were reflected in these books. Petitioner never examined the books nor did she receive from either the accountant or her father prior to 1939 statements respecting the property or the income therefrom. Between the fall of 1934 and sometime in 1939 petitioner spent most of her time living and traveling in European countries, especially France and Italy, her father sending her from $10,000 to $15,000 per year for her living and traveling expenses. Petitioner's assets as reflected by the books as of December 31, 1937 and December 31, 1938, were as follows: Dec. 31, 1937
Dec. 31, 1938
Cash
$ 20,491.26
$ 3,689.17
Stock
176,331.31
None
Mortgage participa-
tion certificates
51,225.00
51,225.00
Total
$248,047.57
$54,914.17
The stock consisted in part of 7,167 shares of Texas Corporation having a cost basis of $176,331.31, all of which was sold by her father during the year 1938 for $297,905.65. The gain was reported on her tax return for that year as a net long term capital gain of $62,068.88. Her income tax returns were prepared and *491 signed by the accountant who kept the books. Her father had complete custody and control of the funds and property and kept them in three New York trust companies. Petitioner was not engaged in business and was not interested in any of her father's business ventures. During the years 1934 to 1938, inclusive, her father withdrew and sold stock belonging to petitioner without her knowledge or consent and used the proceeds in connection with his mining explorations in East Africa in the following amounts: 1934
$ 38,713.54
1935
103,859.51
1936
125,819.08
1937
260,375.25
1938
260,470.76
Total
$789,238.14
The usual procedure followed by petitioner's father in the sale of her stock and use of the funds was to have the stock transferred from the custody accounts in the banks to a brokerage account maintained by him, and upon the sale of the stock by the brokers, the proceeds were transferred by them to foreign banks for his own use. The proceeds from the sale of the stock used by him in his own business ventures was set up on the books as an indebtedness due and owing by him to petitioner. The withdrawal of the stock, sale and transmission of the proceeds to foreign banks *492 for his own use was practically simultaneous. As of January 1, 1938, the books showed the amount of $528,767.38 owing to petitioner by her father. This amount was increased by $260,470.76, representing withdrawals and sale of stock by her father for his own account during 1938. The sales of the stock, the use of the proceeds and the setting up of an indebtedness from her father to petitioner were done by and under his direction and without the knowledge or consent of petitioner. Petitioner's father and the accountant who prepared the return estimated that $118,385.71 of the amount so set up as due petitioner from her father was uncollectible and it was charged off as of December 31, 1938 and taken as a bad debt deduction in the return. Petitioner was informed during the summer of 1939 by her father that he had used her funds for his own ventures and that none of her money was left. He never repaid to her any part of the funds used for his own benefit. All she received was from $10,000 to $15,000 a year for living and traveling expenses. The investments made by petitioner's father in his own business ventures have no value nor does he own other property. The return filed for petitioner *493 for 1938 showed no taxable income. Respondent disallowed the bad debt deduction of $118,385.71 claimed in the return and determined the net income adjusted to be $69,668.47 and assessed a tax deficiency of $17,022.18. Opinion Petitioner contends that her father appropriated the Texas stock to his own use, or sold it and diverted the proceeds to his own business ventures, all without her knowledge or consent, that as a result thereof she realized no gain through the sale of the stock and it was erroneous to include the $62,068.88 in her return as net long term gain from the sale or exchange of capital assets. She further contends that she sustained a deductible loss in 1938 in the amount of the cost of the stock so appropriated and sold, or the amount received by her father from the sale of the stock in that year, less the amount of $15,000 received by her during the year for living and traveling expenses, and that in any event she was not the recipient of net taxable income in 1938. The respondent contends that petitioner realized the gain reported in her return from the sale of the stock, that she is not entitled to the bad debt deduction of $118,385.71 claimed in the return and *494 did not sustain a loss as now claimed by her. He contends that his position that petitioner realized capital gain from the sale of the stock is supported by the letter of authorization of October 29, 1934, wherein the father was given unlimited control over petitioner's property, and that what he did with reference to the property was as her agent, citing , and , modified on another point in . Petitioner is not now insisting on the bad debt deduction of $118,385.71 claimed in the return. The return was made for her by the accountant who kept the books under her father's direction. If petitioner sustained a deductible loss, as she contends, it is immaterial whether the amount of the loss be fixed at the cost basis of the Texas Corporation stock, viz., $176,331.31, or the amount of the proceeds from the sale thereof, viz., $297,905.65, each amount reduced by the maximum living and traveling allowance received by petitioner, viz., $15,000, as in either event, the loss exceeds the adjusted net *495 income determined by the respondent. Section 23 (e), Revenue Act of 1938, provides that in computing net income there shall be allowed as deductions in the case of individuals "losses sustained during the taxable year and not compensated for by insurance or otherwise * * * (3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. * * *." That the property in question was petitioner's property admits of no doubt. Respondent does not argue otherwise. Manifestly if a gift was made the gain resulting from the sale was not petitioner's. A careful reading of the letter of October 29, 1934 shows that the property released from the guardianship was turned over by petitioner to her father to manage and control for her in whatever manner he saw fit during his lifetime with the understanding that a monthly allowance be made to petitioner as in the judgment of her father is warranted by the circumstances, that in the event of petitioner's marriage such allowance out of the income to be fixed at one-fourth of the yearly income realized from the date of such marriage, and that upon the father's death the property *496 or securities then representing the principal be put into a trust fund with the New York Trust Company or any other trustee, the trustee to administer the estate until petitioner reaches the age of 50, at which time she would make further provision for the management and disposition of the estate then to be distributed to her. We think the father in dealing with petitioner's property occupied a position of trust. His use of the property for his own business ventures without petitioner's knowledge or consent was a breach of that trust. Setting up the amount of money diverted to his own use on the books as an indebtedness to petitioner did not make the unauthorized appropriation of petitioner's stock or the proceeds therefrom any the less a loss sustained by petitioner if no recovery was possible. The fact is that by the diversion of petitioner's property or the proceeds thereof by her father to his own use or benefit petitioner was poorer at the end of the year than at the beginning to an extent far in excess of the determined deficiency, however such conduct may be characterized, and as to petitioner it constituted a loss sustained during the taxable year not compensated for by insurance *497 or otherwise. The evidence is clear that no recovery from the father was possible. In this situation was the loss deductible in the taxable year in view of the fact that petitioner did not learn of her father's diversion until 1939? We think it is. In , the Board announced the general rule that embezzlement results in a loss in the year the embezzlement occurs; citing in support thereof the following cases: ; ; ; ; ; ; . The general rule so announced was applied by the Board to the facts in that case. On appeal the , reversed the Board, holding that *498 Congress did not intend that its rule be inelastically and rigidly applied. There the funds were embezzled by an officer of the taxpayer over a number of years, and because the taxpayer, as stated by the court, "was unable to determine the actual dates of the different acts of embezzlement, the results of which together caused its gross loss of nearly one hundred thousand dollars, we believe that the situation is so extraordinary that its total net loss may be deducted in the year when the loss was discovered and its extent determined, that is 1935." It will thus be seen that the First Circuit gives its approval to the general principle that losses are deductible in the year in which the loss occurs as announced in the Board and court cases above cited, but reversed the Board because of the extraordinary facts there present, principally on the ground that the peculations took place over a number of years, the amount in any particular year being impossible of ascertainment. The facts here do not justify a departure from the general rule. The entire loss here sought to be deducted occurred and was sustained in the taxable year before us. Decision will be entered for the petitioner. *499